**E-FILED**
Wednesday, 04 February, 2015  08:54:50 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | |
|---|---|
| Jerry Thompson, Sr., Administrator of the Estate of Jerry Thompson, Jr., deceased, | ) ) ) ) |
| *Plaintiff,* | ) ) |
| *-vs-* | ) ) |
| Wexford Health Services, Inc., a foreign corporation, Dr. Francis Kayira, and Dr. Morufu Alausa, | ) ) ) ) ) |
| *Defendants.* | ) |

## COMPLAINT

Plaintiff, by counsel, alleges as follows:

1.     This is a civil action arising under 42 U.S.C. § 1983, the Illinois Wrongful Death Act, 740 ILCS 180/1 et seq., and the Illinois Survival Statute, 755 ILCS 5/1-1 et. seq. The jurisdiction of this Court is conferred by 28 U.S.C. § 1343 and 28 U.S.C. § 1367(a).

2.     Plaintiff Jerry Thompson Sr. is the duly appointed Independent Administrator of the Estate of Jerry Thompson Jr., who died on February 10, 2013 at St. John's Hospital in Springfield, Illinois.

3.     At all times relevant, plaintiff's decedent was a prisoner in the custody of the Illinois Department of Corrections, confined at the Graham Correctional Center in Montgomery County, Illinois.

4.     Defendant Wexford Health Services, Inc., is a foreign corporation which provides health care to prisoners held by the Illinois Department of Corrections. Plaintiff asserts state and federal law claims against Wexford.

5.     Defendant Dr. Francis Kayira is physician licensed to practice medicine in Illinois who was employed by Wexford at the Graham Correctional Center. Dr. Kayira was in charge of, and personally involved with, the medical care provided to plaintiff's decedent at the Graham Correctional Center. Plaintiff sues Kayira in his individual capacity and asserts state and federal law claims against him.

6.     Defendant Dr. Morufu Alausa is a physician licensed to practice medicine in Illinois. Dr Alausa was in charge of, and personally involved with, the dialysis provided to plaintiff's decedent while he was confined at the Graham Correctional Center. Plaintiff sues Alausa in his individual capacity and asserts state and federal law claims against him.

7.     Plaintiff's decedent had been undergoing dialysis treatment for about two years before his death on February 10, 2013.

8.     As part of his medical care, plaintiff's decedent was subject to frequent blood tests that were analyzed by the laboratory at the University of Illinois Medical Center.

9.      Between November 15, 2012 and January 31, 2013, the University of Illinois Medical Center tested decedent's blood on six or more occasions; repeated tests were positive for growth of "staphylococcus species coagulase negative" and the presence of "gram positive cocci."

10.     The presence of "gram positive cocci" in a blood culture indicates the presence of "coagulase-negative staphylococcus," a common infection in dialysis patients. This type of infection can result in a potentially fatal infection known as sepsis if not treated.

11.     On November 15, 2012, the University of Illinois Medical Center determined that a blood test of plaintiff's decedent showed "growth of staphylococcus species coagulase negative two varieties" and the presence of "gram positive cocci." The report from the University of Illinois Medical Center, which was reviewed by one or more employees of defendant Wexford, stated that "this isolate from a single blood culture suggests contamination" and requested that the health care providers responsible for drawing the blood "review blood culture procedure for venipuncture site prep."

12.     As the proximate result of an explicit policy or a widespread practice of defendant Wexford, defendant Alausa did not learn about the above described blood culture result until November 27, 2012.

13.    Defendant Alausa refused to take any action after learning about the blood culture result.

14.    On December 1, 2012, the University of Illinois Medical Center informed an employee of defendant Wexford that blood drawn from plaintiff's decedent on November 27, 2012 again showed "gram positive cocci."

15.    As the proximate result of an explicit policy or a widespread practice of defendant Wexford, defendant Alausa did not learn about the above describe blood culture result until December 3, 2012. At that time, rather than order treatment for the "gram positive cocci," defendant Alausa ordered another draw and test of blood from plaintiff's decedent.

16.    Employees of defendant Wexford drew blood from plaintiff's decedent on December 4, 2012.

17.    On December 7, 2012, the University of Illinois Medical Center informed an employee of defendant Wexford that blood drawn from plaintiff's decedent on December 4, 2012 again showed "gram positive cocci."

18.    In accordance with the policies of defendant Wexford, this report was not communicated to Dr. Alausa until December 10, 2012.

19.     Defendant Alausa refused to take any action after learning on December 10, 2012 of the third consecutive blood test showing gram positive cocci.

20.     On January 25, 2013, the University of Illinois Medical Center informed an employee of defendant Wexford that blood drawn from plaintiff's decedent on January 24, 2013 again showed "gram positive cocci."

21.     In accordance with the policies of defendant Wexford, this report was not communicated to Dr. Alausa until January 29, 2013.

22.     On January 29, 2013, defendant Alausa was informed about the fourth blood test showing "gram positive cocci." Rather than order treatment for the "gram positive cocci," defendant Alausa ordered another draw and test of blood from plaintiff's decedent.

23.     On January 31, 2013, the University of Illinois Medical Center informed an employee of defendant Wexford that blood drawn from plaintiff's decedent earlier that day again showed "gram positive cocci."

24.     In accordance with the policies of defendant Wexford, this report was not communicated to a physician until February 4, 2013.

25.     A physician employed by defendant Wexford, acting under the direction and control of defendant Kayira, after learning about the

information communicated from the University of Illinois Medical Center on February 4, 2013, ordered that blood again be drawn from plaintiff's decedent. That physician, acting under the direction and control of defendant Kayira, failed to take any other action.

26.    Blood was drawn from plaintiff's decedent at about 8:00 a.m. on February 5, 2013 and conveyed to the University of Illinois Medical Center for testing.

27.    Towards the end of January of 2013, employees of defendant Wexford at the Graham Correctional Center noted spiking in the body temperature of plaintiff's decedent.

28.    In addition to the temperature spiking, Wexford employees observed that plaintiff's decedent was lethargic and dizzy. These conditions continued through February 6, 2013 and were known to defendant Kayira.

29.    A physician who met the ordinary standard of care would have recognized before February 6, 2013 that temperature spiking, lethargy, and dizziness, taken together with the repeated blood test results of "gram positive cocci" required medical treatment at a hospital.

30.    The actions of defendant Alausa in ordering blood tests after learning about the repeated findings of "gram positive cocci" amount to no

treatment at all and constituted deliberate indifference to the serious medical needs of plaintiff's decedent.

31.    In the early morning hours of February 6, 2013, plaintiff's decedent was evacuated from the Graham Correctional Center to the Hillsboro Area Hospital in Hillsboro, Illinois.

32.    A physician at the Hillsboro Area Hospital concluded that plaintiff's decedent required specialized care at a larger hospital and plaintiff's decedent was transported by ambulance to St. John's Hospital, Springfield, Illinois at about 7:00 a.m. on February 6, 2013.

33.    Despite the efforts of medical staff at St. John's Hospital, plaintiff's decedent succumbed to his final illness on February 10, 2013.

34.    After an autopsy, the coroner found that plaintiff's decedent "died from sepsis due to bacterial endocarditis due to chronic end stage kidney disease."

35.    Defendant Kayira was personally involved and responsible for the medical treatment of plaintiff's decedent at the Graham Correctional Center.

36.    Defendant Kayira acted in deliberate indifference to the clearly established constitutional rights of plaintiff's decedent when he turned a blind eye to the repeated positive tests for gram positive cocci

and to the spiking temperatures and lethargy of plaintiff's decedent, and he is therefore liable under 42 U.S.C. § 1983..

37.    Defendant Alausa also acted in deliberate indifference to the clearly established constitutional rights of plaintiff's decedent when he turned a blind eye to the repeated positive tests for gram positive cocci, and he is therefore liable under 42 U.S.C. § 1983.

38.    At all times relevant, Defendant Wexford employed and implemented  policies that permitted and/or required defendants Kayira and Alausa to turn a blind eye to the repeated positive tests for gram positive cocci and the spiking temperature and lethargy of plaintiff's decedent, and it is therefore liable under 42 U.S.C. § 1983.

39.    In the alternative, and to raise and preserve the issue identified by Judge Hamilton in his opinion in *Shields v. Illinois Department of Corrections*, 746 F.3d 782 (7th Cir. 2014), defendant Wexford is liable under 42 U.S.C. § 1983 for the wrongdoing of its employees under the doctrine of respondeat superior. Plaintiff acknowledges that the Seventh Circuit rejected this argument in *Hahn v. Walsh*, 762 F.3d 617 (7th Cir. 2014), *pet. for cert filed* Dec. 8, 2014, No. 14-691, and recognizes that the Court is required to follow that decision of the Court of Appeals.

40.    Defendants Kayira, Alausa, and other health care providers employed by defendant Wexford, owed plaintiff's decedent a duty of reasonable care; each breached that duty when he (or she) ignored the repeated positive tests for gram positive cocci, the spiking body temperature of plaintiff's decedent, and his lethargy and dizziness.

41.    The above described wrongdoing amounts to the Illinois tort of medical malpractice, for which defendant Wexford is liable under the doctrine of respondeat superior.

42.    Plaintiff's decedent died as a result of defendants' above described deliberate indifference and medical malpractice, causing pecuniary and other damages to plaintiff including the loss of society of his son, grief, emotional distress, funeral and burial expenses.

43.    Plaintiffs hereby demands trial by jury.

WHEREFORE plaintiffs prays for judgment against defendants for appropriate compensatory and punitive damages, and that the Court award attorneys fees and costs on plaintiffs' federal claim.

/s/  Kenneth N. Flaxman
Kenneth N. Flaxman
ARDC No. 08830399
Joel A. Flaxman
200 South Michigan Ave. Ste 201
Chicago, Illinois 60604
(312) 663-9500
*Attorneys for Plaintiffs*

## Section 2-622 Certification

The undersigned, an attorney for plaintiff, certifies as follows:

1.       I have consulted and reviewed the facts of the case with a health professional who I reasonably believe: (i) is knowledgeable in the relevant issues involved in the particular action; (ii) practices or has practiced within the last 6 years or teaches or has taught within the last 6 years in the same area of health care or medicine that is at issue in the particular action; and (iii) is qualified by experience or demonstrated competence in the subject of the case.

2.       The reviewing health professional has determined in a written report, after a review of the medical record and other relevant material involved in the particular action that there is a reasonable and meritorious cause for the filing of such action.

3.       I have concluded on the basis of the reviewing health professional's review and consultation that there is a reasonable and meritorious cause for filing of such action.

Dated: February 5, 2015

/s/   Kenneth N. Flaxman
         Kenneth N. Flaxman

July 11, 2013


Neil L. Toppel
200 S. Michigan Avenue
Suite 201
Chicago, IL 60604

RE:    *Thompson, Jerry Lee Jr.*
DOB:   May 3, 1989

Dear Mr. Toppel:

RE: Jerry Lee Thompson, Jr. - Deceased      Date of Birth: 05-03-1989      Date of Death: 02-10-2013

I have reviewed all records provided to me and have the following brief comments. This is a patient who was 23 years of age with known hypertension and chronic renal failure, for which he was being dialyzed over the past two years. He was an alleged drug abuser. The patient, one month prior to his demise, had spiking temperatures and had several blood cultures performed between the months of November and December which grew coagulase-negative Staph epidermidis. These cultures were considered contaminant and thus the patient was not treated. On the early morning of the 6th of February, the patient was transferred to Hillsboro Area Hospital Emergency Room with "weakness." Apparently, he had a cardiac arrest at the correctional institution. He was stabilized at Hillsboro Area Hospital and subsequently transferred to St. John's Hospital in Springfield, Illinois. At the Graham Correctional Center in Hillsboro, he was under the care of Dr. Francis Kayira. At the St. John's Hospital ICU, he was unresponsive but had been stabilized. He had initially third-degree heart block. He had an echocardiogram which showed evidence of suspected endocarditis involving the mitral and aortic valves. His chest x-ray showed cardiomegaly and evidence of vascular congestion and pulmonary edema. He also had a pneumothorax. His blood cultures were positive for coagulase-negative Staphylococcus and the patient was begun on antibiotic therapy. Despite all heroic measures, the patient subsequently died on the 10th of February. Clearly, there was evidence of negligence on the part of the physicians caring for this young man at the correctional institution, based on the presence of three positive blood cultures which were ignored in the face of spiking temperatures and a history of drug abuse. I would suggest obtaining the dialysis records and a list of other physicians caring for this gentleman, inclusive of the name of the nephrologist supervising his dialysis. It would be of interest to know if any of the blood cultures were obtained while he was on dialysis. Clearly, the nephrologist should have had some responsibility in addressing the positive blood cultures as well.